# United States District Court
# District of Massachusetts

TIMOTHY KELLY CORBETT,
      Plaintiff,

      v.                        CIVIL ACTION NO. 11-40221-RBC[1]

CAROLYN W. COLVIN[2],
      ACTING COMMISSIONER OF THE
      SOCIAL SECURITY ADMINISTRATION,
      Defendant.

## MEMORANDUM AND ORDER
## ON PETITION FOR REVIEW (#11)
## AND MOTION TO AFFIRM THE
## COMMISSIONER'S DECISION (#13)

COLLINGS, U.S.M.J.

### I. Introduction

    On November 25, 2011, the plaintiff, Timothy Kelly Corbett ("Corbett"),

---

[1]

    With the parties' consent in October, 2012, this case has been reassigned to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 29 U.S.C. § 636(c).

[2]

    Under Rule 25(d), Fed. R. Civ. P., as of February 14, 2013, Carolyn W. Colvin is substituted for Michael J. Astrue, the former Commissioner of the Social Security Administration.

filed a complaint (#1) against the Commissioner of the Social Security Administration ("the Commissioner").   Corbett alleges that he has been adversely affected by the defendant's decision denying his application for disability insurance benefits and Supplemental Security Income.  On April 26, 2012, an answer to the complaint (#09) was filed and, on the following day, the administrative record of the social security proceedings (#10) was submitted.

On June 7, 2012, the plaintiff filed a petition for review (#11) seeking reversal of the Commissioner's decision together with a memorandum of law (#12).  Thereafter on July 19, 2012, the Commissioner filed a motion (#13) for an Order affirming the decision of the Commissioner, along with a separate memorandum of law (#14).

At this juncture, the record is complete and the cross-motions stand ready for decision.

## II. *Procedural Background*

On January 9, 2009, Corbett filed a Title II application for disability insurance benefits and a Title XVI application for Supplemental Security

Income. (TR at 13)[3]  The claims were initially denied on August 5, 2009, and again upon reconsideration on January 20, 2010. (TR at 13)  Corbett then submitted a request for a hearing before an administrative law judge ("ALJ"), which hearing was held on May 5, 2011. (TR at 13)  The plaintiff appeared at the hearing with his attorney and testified, as did an impartial vocational expert. (TR at 13)

On June 23, 2011, the ALJ issued his decision finding that Corbett was not disabled within the meaning of the Social Security Act and, consequently, denied his claims. (TR at 13-24)  In that decision, the ALJ determined, *inter alia*, 1) that Corbett had "not engaged in substantial gainful employment since October 14, 2007, his alleged [disability] onset date" (TR at 15); 2) that Corbett "has the following severe impairments: status post right elbow surgery with residual osteoarthritis and possible regional pain syndrome" (TR at 15); 3) that Corbett "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1" (TR at 16); 4) that Corbett "has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and

---

[3]
The designation "TR" refers to the SSA Administrative Record, #10.

416.967(b) except he has limited use of the right, dominant upper extremity: he can do no more than occasional pushing and pulling as would require bending of elbow; he can do no more than occasional extended forward reach, i.e., reaching beyond arm's length and no more than occasional overhead reaching" (TR at 16); 5) that Corbett was "unable to perform any past relevant work" (TR at 19); and 6) that "[c]onsidering [Corbett's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Corbett] can perform." (TR at 19)

The plaintiff appealed the ALJ's unfavorable decision to the Appeals Council on July 6, 2011. (TR at 8)  On September 23, 2011, the request for review was denied by the Appeals Council. (TR at 1-5)  The Appeals Council's action had the effect of establishing the ALJ's decision as the final decision of the Commissioner subject to judicial review under 42 U.S.C. § 405(g).  In November, 2011, the present litigation was instituted.

### III. The Facts

Corbett was born in March of 1967. (TR at 19)  He graduated from high school and is able to communicate in English. (TR at 19, 30-31)  The plaintiff

lives in a house that he owns in Fitchburg, Massachusetts, with his fiancé. (TR at 30)  He has a 19-year-old daughter for whom he is responsible. (TR at 30)  Corbett formerly worked as a landscape laborer and a mason. (TR at 31-32; 50-51)

While working as a mason for the Town of Brookline, Corbett injured his right arm as he was setting a 300-pound stone. (TR at 32-33)  He had right elbow surgery in January of 2006, which included "ulnar nerve release and open debridement of multiple loose bodies and spurs." (TR at 266-267, 435-437)  The plaintiff returned to work on a restricted basis with ongoing symptoms of pain and stiffness. (TR at 266)  By August of 2007, his surgeon, Glen Ross, M.D., reported that Corbett had reached "maximal medical improvement for this elbow." (TR at 286)  In light of the degenerative changes due to arthrosis in the elbow which would not improve, Dr. Ross suggested that the plaintiff would be a candidate for job retraining since he could no longer perform high demand heavy lifting masonry. (TR at 286)

Post-surgery, Corbett's treatment included physical therapy and ibuprofen. (TR at 247-252; 281-282)  By September 2007, the physical therapist noted that the plaintiff reported a forty percent improvement in elbow stiffness and his strength was in normal limits. (TR at 262)  That same month a CT scan of

Corbett's right elbow revealed "[n]umerous less than 1 cm loose bodies primarily in the anterior joint space with diffuse osteophyte formations throughout the elbow joint." (TR at 264)   After reviewing the CT scan, in October 2007 Dr. Ross discussed a surgical option with Corbett, but "[r]ight now he is not interested in a surgical approach, given his level of function.  He has pain primarily with work as a Mason and seems to do okay during the other times." (TR at 271)  Dr. Ross determined that the plaintiff was not to lift over twenty pounds and was not to engage in pushing or pulling over thirty pounds. (TR at 272)

The plaintiff's attorney arranged for Corbett to be examined by James G. Nairus, M.D., on March 31, 2008. (TR at 48-49; 462-466)  In his report, Dr. Nairus wrote that Corbett "is unable to lift any objects with his right dominant arm greater than 10 pounds.  He is unable to perform repetitive motions with his right upper extremity." (TR at 463)  Dr. Nairus opined that "[t]he only work [Corbett] would be able to perform at this point would be work that involved mostly the use of his left non-dominant arm, which may be awkward." (TR at 463)

On July 28, 2009, Ronald Jolda, D.O., performed a disability physical examination of the plaintiff. (TR at 456-459) Dr. Jolda's assessment was that

6

Corbett has "right elbow problems.  He has limited ROM of the right elbow and he can't do lifting with the right hand more than about 1 or 2 pounds.  He can't do repetitive work with the right hand.  He can use the right hand normally at table height and the hand itself functions normally." (TR at 459)

On July 30, 2009, S. Ram Upadhyay, D.O., completed a Physical Residual Functional Capacity Assessment of Corbett. (TR at 223-230)  Dr. Upadhyay was of the view that the plaintiff was able occasionally to lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, and sit for six hours in an eight-hour workday. (TR at 224)  Corbett was seen as limited in his ability to push and/or pull in his upper extremities (TR at 224) and should avoid frequent overhead reaching, turning and twisting on the right side. (TR at 226)

On November 23, 2009, the plaintiff had a follow-up office visit with Dr. Ross. (TR at 479)  Dr. Ross noted that Corbett was "losing range of motion," but that he had "[r]easonable biceps triceps strength, [and] good ulnar nerve testing." (TR at 479)  Dr. Ross opined that the plaintiff "will be unable to repetitively use the right arm or use it for any substantial heavy lifting," and that "[h]e will need job retraining and needs to be in a job capacity of sedentary type work." (TR at 479)

Four days later on November 27, 2009, Romany Hakeem Girgis, M.D.,

7

completed a Physical Residual Functional Capacity Assessment of the plaintiff. (TR at 223-231)  This report is virtually identical to the one completed by Dr. Upadhyay, with Dr. Girgis writing "I have reviewed all the evidence in file and the assesment (sic) of light R.F.C. on 7/30/09 is affirmed as written." (TR at 231)

In mid-December of 2009, Dr. John F. O'Brien diagnosed Corbett with flexion deformity in his right elbow with arthritis for which he took ibuprofen giving moderate relief. (TR at 47) Dr. O'Brien opined that the plaintiff could not lift heavy objects, reach out with his right arm, or carry over five to ten pounds. (TR at 472)

On January 7, 2010, Mark Brooks, Ph.D., performed a consultative psychological examination of Corbett. (TR at 474-478)  Dr. Brooks diagnosed the plaintiff with adjustment disorder not otherwise specified with depressed mood, anxiety disorder not otherwise specified, cognitive disorder without otherwise specified (provisional) and a GAF of 60-65[4]. (TR at 478)

On January 19, 2010, Lawrence Langer, Ph.D., completed a Psychiatric

---

[4]

A GAF or Global Assessment of Functioning of 60-65 reflects mild to moderate symptoms or limitations. *See American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV") at 34 (4th ed., text revision 2000).

Review Technique on the plaintiff. (TR at 232-245)  Dr. Langer's diagnosis was the same as that of Dr. Brooks. (TR at 244)  Dr. Langer found that Corbett had mild limitations in activities of daily living, maintaining social functioning and maintaining concentration, persistence or pace, but that he "has normal cognitive function, has adequate ADLs and can interact acceptable (sic) though occasionally pain and depression cause transient irritability." (TR at 244)

On March 7, 2011, Corbett had a follow-up visit with Dr. Ross. (TR at 484-485)  The plaintiff reported that since he had been avoiding heavy lifting that his "elbow has improved considerably with regards to symptoms," although he noted "stiffness and discomfort on a routine basis." (TR at 484)  Corbett's range of motion was observed to be "markedly limited" with "some mild atrophy in the biceps, triceps components." (TR at 484)  Dr. Ross concluded that Corbett's condition was permanent, and that he "would not recommend him for any type of occupation involving heavy lifting or high demand from that elbow." (TR at 484)

On March 23, 2011, Dr. O'Brien completed a Physical Residual Functional Capacity Assessment of the plaintiff. (TR at 488-495)  Dr. O'Brien stated that Corbett could lift twenty pounds occasionally and ten pounds frequently, that he was not impaired with respect to standing or walking, and that he was

9

limited in his right upper extremities due to his elbow in that he cannot fully extend, flex or rotate the hand. (TR at 489)  Dr. O'Brien also opined that the plaintiff was limited in reaching and handling. (TR at 491)

The plaintiff testified that he has been unable to straighten his right arm since his elbow surgery in January 2006, and that it would be "very hard" for him to lift a gallon of milk, although he could lift a quart if he "grabbed it right." (TR at 33-34) He cannot pull, twist or balance with his right arm/hand. (TR at 35, 39, 45)  The plaintiff stated that his left hand is normal and that he could lift forty or fifty pounds with his left arm. (TR at 36)

Corbett explained that he has "two or three bad days a week," meaning that he was in "[e]xcrutiating pain." (TR at 34)  On those days, he takes motrin and goes to bed. (TR at 37-38, 45) On an average day the plaintiff lays down for an hour or two because he does not sleep through the night. (TR at 45)

The plaintiff rated his pain on an average day as being a five out of ten. (TR at 37)  Corbett drives, occasionally does the grocery shopping, and walks his dog. (TR at 36, 40)  He can no longer throw a ball, play basketball, ride his motorcycle or ride a bicycle. (TR at 39)

### IV. The Standard Of Review

Title 42 U.S.C. §405(g) provides, in relevant part:

> Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow... The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive....

The Court's role in reviewing a decision of the Commissioner under this statute is circumscribed:

> We must uphold a denial of social security disability benefits unless 'the Secretary has committed a legal or factual error in evaluating a particular claim.' *Sullivan v. Hudson*, 490 U.S. 877, 885, 109 S.Ct. 2248, 2254, 104 L.Ed.2d 941 (1989). The Secretary's findings of fact are conclusive if supported by substantial evidence. *See* 42 U.S.C. §405(g); *see also Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971).

*Manso-Pizarro v. Secretary of Health and Human Services*, 76 F.3d 15, 16 (1 Cir., 1996) (per curiam); *see also Reyes Roble v. Finch*, 409 F.2d 84, 86 (1 Cir., 1969) ("And as to the scope of court review, 'substantial evidence' is a stringent limitation.").

The Supreme Court has defined "substantial evidence" to mean "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Irlanda Ortiz v. Secretary of Health & Human Services*, 955 F.2d 765, 769 (1 Cir., 1991).  It has been explained that:

> 'In reviewing the record for substantial evidence, we are to keep in mind that "issues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the Secretary." The Secretary may (and, under his regulations, must) take medical evidence. But the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for him, not for the doctors or for the courts. We must uphold the Secretary's findings in this case if a reasonable mind, reviewing the record as a whole, could accept it as adequate to support his conclusion.'

*Lizotte v. Secretary of Health and Human Services*, 654 F.2d 127, 128 (1 Cir., 1981)(quoting *Rodriguez v. Secretary of Health and Human Services*, 647 F.2d 218, 222 (1 Cir., 1981)); *Geoffroy v. Secretary of Health and Human Services*, 663 F.2d 315, 319 (1 Cir., 1981)("In any event, whatever label the parties or the court ascribe to the procedure used to review the Secretary's decision, statute and long established case law make clear that the court's function is a narrow one limited to determining whether there is substantial evidence to support the Secretary's findings and whether the decision conformed to statutory requirements." (citations omitted)).

In other words, if supported by substantial evidence, the Commissioner's

decision must be upheld even if the evidence could also arguably admit to a different interpretation and result. *Ward v. Commissioner of Social Security,* 211 F.3d 652, 655 (1 Cir., 2000); *see also Nguyen v. Chater,* 172 F.3d 31, 35 (1 Cir., 1999) (per curiam).  Lastly,

> Even in the presence of substantial evidence, however, the Court may review conclusions of law, *Slessinger v. Sec'y of Health & Human Servs.*, 835 F.2d 937, 939 (1st Cir.1987) (per curiam)(citing *Thompson v. Harris*, 504 F. Supp. 653, 654 [D. Mass. 1980] ), and invalidate findings of fact that are 'derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts,' *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir.1999) (per curiam).

*Musto v. Halter*, 135 F. Supp.2d 220, 225 (D. Mass., 2001).

## V. Discussion

Corbett argues that the ALJ ignored evidence and misapplied the law in his case "thereby necessitating overturning the decision or the remand of this matter for further consideration of the merits." (#12 at 5)  Numerous specific alleged deficiencies are identified (#12 at 6-8); each of the plaintiff's points shall be addressed, seriatim.

At the outset, Corbett argues that there are a number of inconsistencies in the testimony of the vocational expert such as would render that testimony unreliable.  The plaintiff contends that while the vocational expert testified with respect to the number of jobs that qualified as "light," when questioned by counsel, the expert admitted that the jobs were, in fact, "sedentary."  According to Corbett, this inconsistency was not addressed by the ALJ and, in fact, the ALJ incorrectly stated in his decision that "[p]ursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles[("DOT")]." (TR at 20)

First, the three jobs identified by the vocational expert as "light," information clerk, desk attendant security guard and label inspector (TR at 52), are indeed classified in the DOT as "light." *See*, respectively, DOT 237.367-018

at 1991 WL 672187; DOT 372.667-010 at 1991 WL 673094; and 920.687-042 at 1991 WL 687971.  The vocational expert explained that the jobs described allow for a sit/stand option which is consistent with a sedentary designation[5] (TR at 57, 60), but that "when you have the ability to walk, that would put it at the light level." (TR at 60)   This explanation is consistent with the job descriptions in the DOT.  *See*, e.g., information clerk, DOT 237.367 at 1991 WL 673094 ("STRENGTH: Light Work - Exerting up to 20 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or up to 10 pounds of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Sedentary Work. Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it requires walking or

---

[5]

By definition under the regulations,

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

standing to a significant degree).[6]

When discussing the weight requirements of these positions, the vocational expert explained that she was considering the fact that Corbett could lift 20 pounds with his left arm. (TR at 58-59)   The vocational expert also testified that "there's really no lifting except the inspector position [where] [h]e might lift something that's a couple of ounces." (TR at 59)  She agreed that the jobs she described are different from those in the DOT with respect to the manner in which "they are performed today." (TR at 61)

In sum, the vocational expert testified that, given the limitations detailed in the ALJ's first hypothetical, Corbett could perform the jobs of information clerk, desk attendant security guard and label inspector as described in the

---

[6]

This is also consistent with the regulations:

> (b) Light work. Light work involves lifting no more than 20 pounds at a time
> with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

DOT. (TR at 52)   The fact that those jobs may be performed differently today than they were when defined in 1991 in that they are currently less strenuous, i.e., requiring little or no lifting, simply does not implicate the reliability or veracity of the vocational expert's testimony.[7]

Next, the plaintiff contends that the ALJ relied on the incorrect jobs and job numbers in his decision.   The ALJ found that Corbett had "the residual functional capacity to perform light work...except he has limited use of the right, dominant upper extremity; he can do no more than occasional pushing and pulling as would require bending of the elbow; he can do no more than occasional extended forward reach, i.e., reaching beyond arm's length and no more than occasional overhead reaching." (TR at 16)   These were the factors that were incorporated into the first hypothetical posed by the ALJ to the

---

[7]

Even if, *arguendo*, the positions as performed today would be sedentary rather than light, the fact that Corbett was determined to be able to perform light work in his RFC presupposes his ability to perform sedentary work. *See* 20 CFR § 404.1567(b) ("If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.").   As the Commissioner correctly notes, the plaintiff has failed to show that he was harmed by the ALJ's reliance on jobs that require less lifting or carrying than he was found capable of performing in his RFC. *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.").

vocational expert at the hearing. (TR at 51-52)  In his decision the ALJ wrote:

> the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity.  The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as information clerk (1000 jobs locally and 125,000 nationally); label inspector (1200 jobs locally and 150,000 nationally); and desk attendant/security (1000 jobs locally and 100,000 nationally).

TR at 20.

These findings precisely track the testimony of the vocational expert in response to the first hypothetical. (TR at 52)

Corbett complains that the ALJ's conclusions with respect to jobs and job numbers are inconsistent with the answer that the vocational expert gave to the second hypothetical the ALJ asked.   In that second hypothetical, the ALJ imposed further restrictions on the right arm/hand, essentially making it a helper hand. (TR at 20,  52)  The answer to the plaintiff's complaint is simple: the ALJ explicitly did not include that further restriction in Corbett's RFC (TR at 20) so the job numbers given in response to the second hypothetical are irrelevant.

As a third point, Corbett asserts that "the ALJ failed to recognize the

vocational expert's opinion that even with mild restrictions, which would interrupt the claimant's ability to perform or sustain employment, two hours out of an eight hour day, the claimant would be found to be disabled." (#12 at 6) The answer is again simple: the issue is not one of "recogniz[ing] the vocational expert's testimony." Rather, based on Corbett's testimony, the ALJ included the amount of time the plaintiff purportedly would be off task during the work day due to rest periods in a hypothetical posed to the vocational expert (TR at 57)[8], but ultimately did not include that additional restriction in the plaintiff's RFC. (TR at 16)   The vocational expert's testimony on this point proved to be irrelevant.

Corbett claims that Dr. Nairus was a treating physician and that the ALJ erred in classifying Dr. Nairus' report as a "solicited opinion."   The plaintiff is incorrect.   According to his own testimony, Corbett saw Dr. Nairus on one occasion at his attorney's request. (TR at 48-49)   Under the regulations,

> Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we

---

[8]

The plaintiff cites to the ALJ's hypothetical (TR at 57), not the later hypothetical posed by his own attorney (TR 61-62). (#12 at 6)

> will consider that you have an ongoing treatment
> relationship with an acceptable medical source when
> the medical evidence establishes that you see, or have
> seen, the source with a frequency consistent with
> accepted medical practice for the type of treatment
> and/or evaluation required for your medical
> condition(s). We may consider an acceptable medical
> source who has treated or evaluated you only a few
> times or only after long intervals (e.g., twice a year) to
> be your treating source if the nature and frequency of
> the treatment or evaluation is typical for your
> condition(s). We will not consider an acceptable
> medical source to be your treating source if your
> relationship with the source is not based on your
> medical need for treatment or evaluation, but solely on
> your need to obtain a report in support of your claim
> for disability. In such a case, we will consider the
> acceptable medical source to be a nontreating source.

20 C.F.R. § 404.1502.

Because Dr. Nairus does not meet the definition of a treating source, it was not incumbent on the ALJ to afford his opinion controlling weight. *See* SSR 96-2p, 1996 WL 374188, at *2 (To be accorded controlling weight, "[t]he opinion must come from a 'treating source,' as defined in 20 CFR 404.1502.")

Without further development, the plaintiff baldly states:

> As part of consultative report 3F, Dr. Lawrence
> Langer, concludes that Mr. Corbett has mild restrictions
> in some areas. (Rec. 232)  The ALJ, however, finds that
> Mr. Corbett suffers from no mental impairment until
> May 4, 2009. (Rec. 16)

TR at 7.

Corbett mischaracterizes the ALJ's decision.

The ALJ wrote as follows:

> While there are allegations of mental impairment, these
> have not been established as a severe medically
> determinable impairment.   The longitudinal history
> shows that on 1/13/09, no mental problems were
> observed at the Social Security Field Office [1E-2].   On
> 5/4/09, while alleging problems with task completion
> and concentration, the claimant alleged none with
> understanding, following instructions, memory, or
> interaction.  He did express problems with stress and
> changes in routine. [5E-6,7].  This is the first mention
> of depression as a problem [5E-1,2]; nonetheless the
> claimant reported going out daily, including driving
> and going out alone [5E-4].

TR at 16.

The ALJ acknowledged that the plaintiff had been diagnosed with adjustment

disorder, NOS, anxiety disorder, NOS and cognitive disorder, NOS (TR at 16),

which is virtually identical to Dr. Langer's diagnosis (TR at 244).   The ALJ

further found that "[w]hile there are allegations of mental impairment, these

have not been established as a severe medically determinable impairment." (TR

at 16)  This conclusion, too, is entirely consistent with that of Dr. Langer who

found that the plaintiff's mental impairment was not severe (TR at 232) and

that he "has normal cognitive function, has adequate ADLs and can interact

21

acceptable (sic) though occasionally pain and depression cause transient irritability." (TR at 224)

In short, the ALJ's conclusions regarding the severity of Corbett's mental impairment are completely consistent with, and supported by, the Psychiatric Review Technique completed by Dr. Langer.[9]

Corbett contends that the ALJ did not properly assess his credibility.  The applicable standard bears repetition: "It is the responsibility of the Secretary to determine issues of credibility and to draw inferences from the record evidence. Indeed, the resolution of conflicts in the evidence is for the Secretary, not the courts." *Irlanda Ortiz*, 955 F.2d at 769 (citations omitted).  "The credibility determination by the ALJ, who observed the claimant, evaluated his demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings." *Frustaglia v. Secretary of Health and Human Services*, 829 F.2d 192, 195 (1 Cir., 1987).

In his decision, the ALJ reviewed the medical evidence in detail and at length. (TR at 17-18)  The ALJ also considered the plaintiff's testimony:

---

[9] If the plaintiff's point is one of timing, i.e., the ALJ erred when he found no evidence of depression prior to May 4, 2009 when Dr. Langer's report covers the period from 10/14/2007 to 12/31/2008 (the report is dated 01/19/10) (TR at 232), the contention borders on the frivolous.  Corbett does not challenge the substance of the ALJ's findings vis-a-vis the level of severity of the plaintiff's mental impairment or the fact that those findings are supported by the evidence.

22

> The claimant's testimony is found to be insufficient to support the conclusion that the claimant has limitations greater than those just identified. There is a substantial disparity between the claimant's complaints and the objective medical findings contained in the record. The undersigned finds that the claimant's complaints of constant, incapacitating pain are neither reasonably consistent with those medical findings, not sufficiently credible as additive evidence to support a finding of disability. Moreover, the claimant's ability to manage a wide range of daily activities belies his allegation of total disability. The claimant's doctors have mentioned no other serious medical problems which would impact on his ability to work. He takes only ibuprofen as needed for pain. He reports his symptoms are much improved. He cannot engage in heavy lifting or repetitive use of the right arm, but he has no other medically determinable impairments which further reduce his functional capacity.

TR at 18.

The ALJ thoroughly examined the medical records, the treatment records, the RFCs, the plaintiff's complaints and his daily activities. It was well within the ALJ's purview to reject any of Corbett's complaints to the extent they exceeded the medical evidence.

The plaintiff sees an inconsistency in the ALJ's statement when evaluating Corbett's mental status in step two of the five-part evaluative process[10] and his

---

[10] That statement is as follows: "At the hearing on May 5, 2011, the claimant presented well. He appeared credible, i.e., he did not seem to exaggerate when given the opportunity. He testified coherently

ultimate assessment of the plaintiff's credibility based on the overall record. However, the ALJ did not find that Corbett was believable on the one hand and unbelievable on the other. Rather, the ALJ concluded that the plaintiff had "residual pain and dysfunction of the right upper extremity status post right elbow surgery" (TR at 18), but that his limitations were not as severe as alleged. In other words, the ALJ found the plaintiff to be forthright, but did not accept the degree of disability that Corbett claimed.

In sum, substantial evidence in the record supports the ALJ's assessment of the plaintiff's credibility. In these circumstances, it is not in the Court's province to interfere with the ALJ's judgment.

Corbett argues that the ALJ "mischaracterized the evidence when he concluded that he was not disabled because the claimant only used Ibuprofin for his pain." (#12 at 7)  The ALJ reviewed the medical evidence which reported Corbett's use of ibuprofen for pain relief (TR at 17-18) and the plaintiff testified that he took motrin to alleviate his pain. (TR at 37-38)  It is true that the ALJ did not recite that Corbett had taken percocet post-surgery, but that was in January 2006 years before the hearing and the plaintiff testified that he did

---

and cogently, and was a good historian." (TR at 16)

not take prescription medication because it upset his stomach. (TR at 46-47) Moreover, the fact that Corbett took ibuprofin for pain was only one factor the ALJ considered in making his pain finding.

The ALJ did not ignore the plaintiff's testimony regarding his level of pain or the medical evidence about it.  To the contrary, the ALJ specifically found the "residual functional capacity assessment is supported by the medical record which shows that the claimant has residual pain and dysfunction of the upper right extremity status post right elbow surgery" (TR at 18) and, further, "that the claimant's complaints of constant, incapacitating pain are neither reasonably consistent with those medical findings, nor sufficiently credible as additive evidence to support a finding of disability." (TR at 18)

The ALJ considered all of the evidence in making his findings with regard to the plaintiff's pain.  There is substantial evidence in the record to support the ALJ's conclusions.  There is no error here.

## VI. Conclusion and Order

For all the reasons stated, it is ORDERED that the Petition For Review (#11) be, and the same hereby is, DENIED.  It is FURTHER ORDERED that the Motion To Affirm The Commissioner's Decision (#13) be, and the same hereby is, ALLOWED.  Judgment shall enter for the defendant.


*/s/ Robert B. Collings*

ROBERT B. COLLINGS
United States Magistrate Judge

March 28, 2013.

26